UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TRADE EXCHANGE NETWORK LIMITED and INTRADE THE PREDICTION MARKET LIMITED<br><br>Defendants. | Civil Action No. 12-1902 (RCL) |

## MEMORANDUM OPINION
(Summary Judgment)

In this case, plaintiff, the United States Commodity Futures Trading Commission ("CFTC" or "Commission"), alleges that Trade Exchange Network Limited ("TEN"), an Irish company, and Intrade the Prediction Market Limited ("Intrade"), an Irish company, violated Section 4c(b) of the Commodity Exchange Act ("CEA" or "the Act"), 7 U.S.C. § 6(c)(b) (2012), and Commodity Futures Trading Commission Regulation ("Regulation") 32.11, 17 C.F.R. § 32.11 (2012) [Count I]. CFTC also alleges that TEN violated CFTC's 2005 Commission Order and Section 6c of the Act, 7 U.S.C. § 13a-1 (2012) [Count II], as well as that TEN and Intrade violated Section 9(a)(3) of the Act, 7 U.S.C. § 13(a)(3) (2006) [Count III].

Before the Court are the CFTC's Motion for Partial Summary Judgment as to Counts I and II of the Complaint, ECF No. 47, TEN and Intrade's Memorandum in Opposition, ECF No. 51, and the CFTC's Reply, ECF No. 53. The Court will GRANT plaintiff's motion for partial summary judgment as to Counts I and II of the complaint.

1

I.   **BACKGROUND.**

Defendants TEN and Intrade are both companies organized under the laws of Ireland with principal places of business in Dublin, Ireland. Answer ¶¶ 14-15, ECF No. 7. In 2005, the CFTC entered an administrative order ("2005 Commission Order") against TEN for violating Section 4c(b) of the CEA, 7 U.S.C. § 6c(b) (2002), and Regulation 32.11 of the CFTC's Regulations, 17 C.F.R. § 32.11 (2004) by "soliciting and accepting orders from U.S. residents for commodity options not otherwise excepted or exempted from the Commission's ban on options." Trade Exch. Network, Comm. Fut. L. Rep. ¶ 30135 (Sept. 29, 2005) ("2005 Commission Order"), ECF No. 47-3. TEN acknowledged service and consented to the entry of the 2005 Commission Order. 2005 Commission Order; Answer ¶ 1. The 2005 Commission Order found that:

> "TEN, through its websites, offers for trading to U.S. residents, as well as residents of all other nations, commodity option contracts. The contracts have a specific strike price and trade at values between 0 and 100. Traders buy and sell the contracts based on their belief as to whether the contract will settle closer to 0 or 100. For example, TEN offered a Gold Futures Year End 2005 contract that had a strike price of $300. Traders bought the contract in anticipation that the year end closing price of gold futures would reach $300, or they sold the contract in anticipation that the strike price would not be achieved. TEN's websites offered other commodity option contracts including Daily Crude Oil, Light Sweet Crude Oil Futures Year End, Intraday Euro versus U.S. Dollar Rate, U.S. Dollar versus Yen Cash Rate, and Scheduled Federal Open Market Committee Rate Announcements."

(2005 Commission Order at 2.)

TEN, without admitting or denying the findings in the 2005 Commission Order, agreed to refrain from violating Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2002) and Regulation 32.11, 17 C.F.R. § 32.11 (2004) in the future, to pay a civil monetary penalty in the amount of $150,000, and to perform additional requirements under the Commission Order, including informing TEN's U.S. customers that certain contracts are unavailable for them to trade on TEN's trading websites

2

by "utilizing a pop-up notice that will appear when [U.S.] customers attempt to enter orders on those contracts." *Id.* at 3, 5. TEN also agreed it would "not undertake any act that would limit its ability to fully cooperate with the Commission." *Id.* at 6. At the time of the 2005 Commission Order, TEN designated Michael Phillip, Esq. to "receive all requests for information pursuant to this undertaking." *Id.* Further, TEN agreed to give written notice to the Division of Enforcement of intention to change the designated U.S. representative fourteen (14) days before it occurs. *Id.*

Intrade.com is an internet-based "platform where [customers] make predictions by buying and selling shares on the outcome of real-world events." *How Intrade Works*, Intrade: The World's Leading Prediction Market (Dec. 28, 2011), www.intrade.com, ECF No. 47-22. "There are two possible outcomes to each of these events – yes, the event will happen as described, or no, it will not happen." *Id.* The website allows customers to buy shares if they are predicting that the market event will happen and to sell shares if they are predicting that the event will not happen. *Id.* "Because a market will always settle at either $0.00 or $10.00, all shares are bought and sold at prices somewhere in between." *Id.* If the event occurs, the contract settles at $10; if the event does not occur, it settles at $0. *Id.* The customer who purchased shares makes a profit if price of the market goes up, and the customer who sold shares makes a profit if the price of the market goes down. *Id.* For example, if a customer purchases shares at $7 per share and the market settles at $10, then the customer will make a profit of $3 per share. *Id.*

In early 2007, TEN deconsolidated into three separate entities. TEN's 3d Supp. Resp. Interrog. No. 6, ECF No. 51-2. "As a result of the reorganization, which took effect on or about February 28, 2007, TEN transferred its non-sports prediction markets and technology-related intellectual property to Intrade." *Id.* "Intrade obtained ownership of or usage rights to the www.intrade.com domain, TEN's customer lists and historical market data, all open nonsports

[sic] positions on TEN's trading platform, and orders and member funds sufficient to cover the same." *Id.* TEN and Intrade had separate corporate registration numbers under Irish law, maintained separate bank accounts and filed separate tax returns and financial accounts. *Id.* During the relevant period, most of Intrade's shares were owned by persons who also owned shares of TEN, with an approximately 80% overlap between the shareholders of TEN and Intrade per director Ronald Bernstein's "best guess." TEN's Resp. Req. Admis. No. 8, ECF No. 47-7; Bernstein Dep. 48:1-13, Dec. 18, 2014, ECF No. 56-1. TEN did not own any portion of Intrade. TEN's Resp. Req. Admis. No. 8. Between 2007 and December 2014, TEN and Intrade shared the same directors (Geraldine Arnold, Imants Auzins, Patrick Caulfield, Christopher Delaney, John Delaney and Daniel Laffan) and officers (John Delaney and Daniel Laffan). TEN's Supp. Resp. Interrog. No. 7, ECF No. 47-18; Intrade's Supp. Resp. Interrog. No. 7, ECF No. 47-19. TEN had no employees during the relevant period. TEN's Supp. Resp. Interrog. No. 7. Between 2007 and December 2014, TEN and Intrade shared the same premises at various offices in Dublin, Ireland. Wolfenden Dep. 50:21-22; 51:1-22; 52:1-22; 53:1-4, 53:5-14, 62:12-15, ECF No. 56-9. TEN and Intrade "shared the same premises, addresses and office equipment, such as copiers and computers." Bernstein Dep. 75:1-12, Dec. 18, 2014.

During the period from September 2007 to June 25th, 2012 (the "relevant period"), TEN's bank accounts (in the name of Trade Exchange Network Ltd.) accepted funds from U.S. customers for the purpose of trading contracts based on future changes in the price of gold, the U.S. unemployment rate, U.S. gross domestic product figures and the price of currency pairs. TEN's Resps. Reqs. Admis. Nos. 27-31. TEN received these funds "on behalf of Intrade and carried a corresponding liability from TEN to Intrade for any and all such amounts." TEN's Resps. Reqs. Admis. Nos. 27-31. Intrade also maintained bank accounts that received funds from U.S.

customers for the purpose of trading the abovementioned contracts. Intrade's Resps. Reqs. Admis. Nos. 27-31, ECF No. 47-8. From 2007 to 2012 TEN maintained Intrade funds in its bank accounts. Bernstein Dep. 77:1-4, Dec. 18, 2014. For example, TEN's National Irish Bank accounts contained funds received from Intrade account holders, including U.S. customers who had opened trading accounts through www.intrade.com. Wolfenden Dep. 208:1-22, 209:1-22, 210:1-9, 211:1-21. Intrade and TEN also transferred funds between their respective bank accounts at various points in 2008 and 2009. Wolfenden Dep. 108:1-17, 210:10-13, 210:20-22, 211:8-15.

During the relevant period, U.S customers opened trading accounts on www.intrade.com and traded contracts based on future changes in the price of gold, the U.S. unemployment rate, the U.S. gross domestic product figures and the price of currency pairs. Intrade's Resp. Req. Admis. No. 21-22, 26. Intrade offered for trading through www.intrade.com such contracts as "February 2011 (G12) Gold Futures to Close on or above 1000 on Dec 2011," "Euro/U.S. Dollar to close on or about 1.000 on 30 Dec 2011," "U.S. will go into recession during 2011," and "75 or more U.S. banks to fail during 2011." Intrade's Resp. Req. Admis. No. 20. During the relevant period, U.S. Customers traded 5,503 contracts in the areas of commodities, currencies, gasoline, climate and weather, and U.S. economic numbers. Harris Decl. ¶ 9, ECF No. 47-24. U.S. customers funded their trading accounts by transferring money to bank accounts in Ireland in the names of Trade Exchange Network, Ltd. or Intrade The Prediction Market, Ltd.. Beyer Decl. ¶¶ 5-6, ECF No. 47-26; Wu Decl. ¶¶ 5-6, ECF No. 47-27.

Between September 1, 2007 and June 25, 2012, 443 contracts in commodities, currencies, gasoline, climate and weather, and U.S. economic numbers were blocked to U.S. customers on www.intrade.com, while 2,027 contracts in commodities, currencies, gasoline, climate and weather, and U.S. economic numbers were not blocked. Harris Decl. ¶ 16. At the end of 2010,

Intrade and TEN's then-director and officer John Delaney instructed Carl R. Wolfenden, Intrade and TEN's Exchange Operations Manager, to disengage the existing blocks on www.intrade.com in order to permit U.S. customers to trade contracts in commodity and currency markets. Wolfenden Dep. 110:10-22, 111:3-6.

In February 2012, TEN's former U.S. representative, Michael Phillipp, withdrew as counsel. Answer ¶ 32. TEN did not provide the CFTC with written notice of their intent to change their designated U.S. representative pursuant to the 2005 Commission Order. TEN's Resp. Req. Admis. No. 37.

On November 26, 2012, the CFTC filed suit in this Court.

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

In making a summary judgment determination, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "the mere existence of a scintilla of evidence in support of the non-moving party" is

insufficient to create a genuine dispute of material fact. *Id.* at 252. Instead, evidence must exist on which the jury could reasonably find for the non-moving party. *Id.*

### III. ANALYSIS

#### A. Count I: TEN's and Intrade's Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 32.11, 17 C.F.R. §32.11 (2012).

Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), states:

> No person shall offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under [the CEA] which is **of the character of, or is commonly known to the trade as**, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guaranty," or "decline guaranty," contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7 U.S.C. § 6c(b) (2012) (emphasis added).

Regulation 32.11 made it "unlawful . . . for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged." 17 C.F.R. § 32.11 (2012). Regulation 32.1(b)(1) similarly defines "commodity option transaction" and "commodity option" to mean "any transaction or agreement in interstate commerce which is or is held out to be **'of the character of, or is commonly known to the trade as, an 'option'. . . .'**" 17 C.F.R. §32.1(b)(1) (2012) (emphasis added). TEN and Intrade argue that the Commission has not demonstrated that the contracts in question fit within the statutory and regulatory definitions of commodity options. Defs.' Opp'n at 7.

### 1. *The Financial Instruments Available for Trading on www.intrade.com Are Known to the Trade as Binary Options.*

TEN and Intrade rely on a narrow definition of the term "option," namely "a contractual right to buy, or sell, a commodity, or commodity future by some specific date at a specified, fixed price, known as the 'strike price.'" Defs.' Opp'n at 7 (citing *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 675 (S.D.N.Y. 1979)). TEN and Intrade argue that the contracts offered on www.intrade.com are not options since they do not have certain characteristics of options under the above definition, including a "strike price," a "mechanism for delivery of an underlying asset," and a "contractual right for the buyer to buy or sell a specified quantity of a commodity at a specific price within a specific period of time." Defs.' Opp'n at 9.

There is little case law on the issue of whether the financial instruments offered by the defendants are options under the Act. One court determined that financial products that bear the characteristics of the contracts offered on www.intrade.com are not "options" under a preliminary injunction standard, but the court was not interpreting the CEA or determining whether the financial products are subject to the Commission's authority. *See Sec. & Exch. Comm'n v. Banc de Binary Ltd.*, 964 F. Supp. 2d 1229, 1234 (D. Nev. 2013). In another case, the court declined to dismiss claims where the defendants relied on the argument that binary options are not "options" subject to CFTC's authority under the CEA and the Regulation. *See U.S. Commodity Futures Trading Comm'n v. Bank de Binary, Ltd.*, No. 2:13-CV-000992-MMD, 2014 WL 691590, at *4 (D. Nev. Feb. 20, 2014).

The language of the Act does not limit the scope of CFTC's regulation solely to the specific definition suggested by the defendants. 7 U.S.C. § 6c(b) (2012). Rather, the Act prohibits "any transaction involving any commodity regulated under [the CEA] which is of the character of, or is

commonly known to the trade as, an "option," "privilege," "indemnity," bid," "offer," "put," "call," "advance guaranty," or "decline guaranty[.]" *Id.* In addition, the Act itself does not distinguish between physically-settled and cash-settled options, meaning the delivery of the underlying asset is not a requirement. *See Caiola v. Citibank, N.A. N.Y.*, 295 F.3d 312, 325 (2d Cir. 2002).

The contracts offered on www.intrade.com meet the characteristics of what are known to the trade as "binary options." "**Binary options are options** with discontinuous payoffs. A simple example of a binary option is a *cash-or-nothing* call. This pays off nothing if the asset price ends up below the strike price at time $T$ and pays a fixed amount, $Q$, if it ends up above the strike price. . . . A cash-or-nothing put is defined analogously to a *cash-or-nothing* call. It pays off $Q$ if the asset price is below the strike price and nothing if it is above the strike price." Pl.'s Reply at 7 (citing John C. Hull, *Fundamentals of Futures and Options Markets* 481 (7th ed. 2011) (italics in original, bold added), ECF No. 53-3; *see also* Robert W. Kolb, *Futures, Options, and Swaps* 583 (2d ed. 1997) ("Binary options have payoffs that are discontinuous, either paying nothing or a considerable amount depending on the satisfaction of some condition."), ECF No. 53-3). Ballentine's Law Dictionary offers multiple definitions for the term "option," including that it is a "simple method of speculating in the rise or fall of the market price of commodities or stocks, no actual transaction by sale or purchase being contemplated." Pl.'s Reply at 11 (citing *Ballentine's Law Dictionary* 894 (3d ed. 1969)).

Further, these types of options are known as options in industry practice. Several Designated Contract Markets, including the Chicago Mercantile Exchange and the North American Derivatives Exchange, Inc., offer binary options. Pl.'s Reply at 8. NADEX offers a wide variety of binary option markets, including stock indices, currencies, economic events, such

as jobless claims (the number of Americans applying for unemployment benefits), and commodities. *See* Pl.'s Reply at 8 (citing *Markets*, NADEX, www.nadex.com/markets-to-trade.html). NADEX defines binary options as "limited risk contracts based on a simple yes/no market proposition like will the markets go up by the end of the trading week." *What Are Binary Options*, NADEX, www.nadex.com/trade-binary-options.html. Similarly to the contracts available at www.intrade.com, the customer's "profit/loss is calculated using the difference between the settlement price . . . and [the customer's] opening price." *Id.*

The contracts available for trading on www.intrade.com allowed customers to make predictions on the occurrence of events by either buying or selling shares. *See How Intrade Works*, Intrade: The World's Leading Prediction Market (Dec. 28, 2011), www.intrade.com. There are two possible outcomes to every event – either the event will happen or it will not. *See id.* If a customer predicts that the event will occur, the customer will buy shares; if the customer predicts that the event will not occur, the customer will sell shares. *Id.* If the event occurs, the market will settle at $10, and if it does not, it will settle at $0. *Id.* During the relevant period, Intrade offered for trading through intrade.com such contracts as "February 2011 (G12) Gold Futures to Close on or above 1000 on Dec 2011," "Euro/U.S. Dollar to close on or about 1.000 on 30 Dec 2011," "U.S. will go into recession during 2011," and "75 or more U.S. banks to fail during 2011." Intrade's Resp. Req. Admis. No. 20. These contracts possess all the characteristics of contracts that are known to the trade as "binary options."

The Supreme Court has long recognized that "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Bragdon v. Abbott*, 524 U.S. 624 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)); *see also Chevron U.S.A. Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."). The CFTC has previously regulated binary options. In 2004, the Commission granted HedgeStreet Inc.'s (now known as NADEX) application to become a Designated Contract Market ("DCM"), which allowed it to lawfully offer binary options on specific commodities to U.S. customers. Pl.'s Reply at 9 (citing Div. of Mkt. Oversight, U.S. Commodity Futures Trading Comm'n, Designation Memorandum: Application of HedgeStreet, Inc. for Designation as a Contract Market pursuant to Section 5 and 6(a) of the Commodity Exchange Act (Feb. 10, 2004) at 29-30, *available at* http://sirt.cftc.gov/SIRT/SIRT.aspx?Topic=TradingOrganizationsAD&Key=39). In granting HedgeStreet, Inc. designation as a DCM, the Commission defined "binary option" as a "cash-settled option with a fixed payout rather than a payout based on how deep the option is in the money." *Id.* at 2. Similarly to the contracts available for trading on www.intrade.com, the financial instruments offered by HedgeStreet, Inc. consist of a call option and a put option. *Id.* at 29. If HedgeStreet, Inc. lists a contract on a certain index with the strike price of 100, "[a] put option on this index would expire in the money if the underlying index value is less than or equal to 100, while the call option on that same index would expire in the money if the underlying index value is greater than 100." *Id.* If the index level is above 100, the call option would be in the money and pay a fixed sum of $10. *Id.*

TEN and Intrade do not fall within any exceptions under the Act that would allow them to lawfully offer commodity options for trading. Neither TEN nor Intrade fall into the any of the following categories: Designated Contract Market ("DCM") per Section 4(a) of the Act, 7 U.S.C. §6(a) (2012); an exempt foreign board of trade ("FBOT") or an exempt board of trade ("EBOT")

11

per Section 5d of the Act, 7 U.S.C. § 7a-3 (2012). TEN's Resps. Req. Admis. No. 12-17; Intrade's Resps. Req. Admis. No. 12-14, 16-17.

### 2. *The Financial Instruments Available for Trading on www.intrade.com Involved Commodities Regulated by the Act.*

TEN and Intrade also argue that "Count I is based on a significant number of contracts that did not involve a 'commodity' regulated under the CEA." Defs.' Opp'n at 12. TEN and Intrade argue that a large number of the contracts in question were based on questions about weather events and economic statistics, not "goods or articles." *Id.* at 13. Under the Act, the term "commodity" includes the listed agricultural commodities (such as wheat, cotton and rice) and "all other goods and articles, except onions . . . and motion picture box office receipts . . . , and all services, rights and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(4) (2012). Under this definition, the 228 contracts in gold contracts, 48 contracts in crude oil contracts, 41 contracts in currencies and 1,831 contracts in gasoline are commodity options under the Act. Harris Decl. ¶ 10.

The span of the Act's definition of "commodity" is further demonstrated by the definition of "excluded commodity," which includes currency, index or measure of inflation, "any other rate, differential, index, or measure of economic or commercial risk, return or value," "an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is beyond the control of the parties to the relevant contract, agreement, or transaction; and associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19) (2012). These commodities were excluded only under Sections 2(d) and 2(g) of the Act. 7 U.S.C. §§ 2(d), 2(g) (2006). Sections 2(d) and 2(g) applied only to agreements between parties that are "eligible contract participants" (ECPs) that were not "executed

or traded on a trading facility" or "subject to individual negotiation by the parties." *Id.* During the relevant period, the U.S. customers that traded binary options were not eligible contract participants, since they each had individual net worth of less than $5 million. *See* Rosa Decl. ¶ 1, ECF No. 47-25; Beyer Decl. ¶ 7; Wu Decl. ¶ 7; 7 U.S.C. § 1a (2012) (defining an "eligible contract participant" as "an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of (I) $10,000,000 or (II) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual"). Furthermore, the contracts were traded on the intrade.com website, and thus were not "subject to individual negotiation by the parties." Therefore, the "excluded commodity" category does not apply to the contracts in question, and instead serves as further proof of the scope of the definition of commodity under the CEA. As a result, the 911 climate and weather contracts (including 420 contracts concerning the hurricane season and 491 contracts about New York City snowfall) and 2,444 contracts regarding U.S. economic numbers are commodity options under the Act. Harris Decl. ¶ 10.

### B. Count II: TEN's Violations of Section 6c of the Act, 7 U.S.C. § 13a-1 (2012)

TEN violated Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which allows the CFTC to seek injunctions for "engaging . . . in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or *order* thereunder." 7 U.S.C. § 13a-1 (2012) (emphasis added).

TEN argues that a factual dispute exists regarding whether TEN had customers during the relevant period. Defs.' Opp'n at 14. TEN argues that it did not have customers because on or about February 28, 2007, TEN deconsolidated into three separate entities in order to "separate TEN's

non-sports prediction markets from its sports markets" and TEN "transferred its non-sports prediction markets and technology-related intellectual property to Intrade." TEN's 3d Supp. Resp. Interrog. No. 6. As a result of the reorganization, "Intrade obtained ownership of or usage rights to the www.intrade.com domain, TEN's customer lists and historical market data, all open nonsports positions on TEN's trading platform, and orders and member funds sufficient to cover the same." *Id.* In addition, TEN did not earn any revenue from trading; all revenue earned from trading during the relevant period was reported on Intrade's tax returns. *Id.* TEN argues that the companies did not operate as a single business because they had separate corporate registration numbers under Irish law, maintained separate bank accounts and filed separate tax returns and financial accounts. Defs.' Opp'n at 15.

In determining whether several business entities are operating as a common enterprise, courts look to whether the companies "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing," *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014), as well as whether "corporate formalities are observed," and whether the companies conduct business at arm's length, *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir. 1973); *see also CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (finding existence of a "common enterprise" for the purposes of the CEA where defendant companies were under common control, did not operate at arm's length, shared a mailing address, commingled funds and one of the defendants advertised exclusively through the other). Under the common enterprise theory of liability, TEN and Intrade operated as a common enterprise. TEN and Intrade were operating under common control between 2007 and December 2014 because TEN and Intrade had the same directors and officers during that period. TEN's Supp. Resp. Interrog. No. 7; Intrade's

14

Supp. Resp. Interrog. No. 7. TEN and Intrade shared office space at multiple Dublin offices each time the companies moved. Wolfenden Dep. at 50:21-22, 51:1-22, 52:1-22, 53:1-4, 62:12-15, 53:5-14. In addition, TEN and Intrade commingled funds. Importantly, TEN maintained Intrade funds in its bank accounts from 2007 to 2012, Bernstein Dep. at 77:1-4, ECF No. 56-1, TEN maintained bank accounts that accepted funds from U.S. customers for the purpose of trading contracts based on future changes in the price of gold, the U.S. unemployment rate and U.S. gross domestic product, TEN's Resp. Req. Admis. No. 27, and Intrade transferred funds from its bank account to TEN's bank account on at least four different occasions, Wolfenden Dep. at 108:1-17, 210:10-13, 210:20-22, 211:8-15. Thus, since TEN and Intrade are jointly and severally liable under the common enterprise theory of liability, TEN is liable for violating the 2005 Commission Order.

First, TEN violated the 2005 Commission Order by offering for trade through www.intrade.com the contracts prohibited by the Commission Order. As discussed in the previous section, during the relevant period, TEN and Intrade allowed U.S. customers to trade 5,503 prohibited contracts through www.intrade.com. Harris Decl. ¶ 10. In addition, John Delaney, then-director and officer to TEN and Intrade, asked Wolfenden to "open up" commodity and currency markets to U.S. customers on December 29, 2010, when the 2005 Commission Order was still in force. Wolfenden Dep. at 112:13-15. Accordingly, Wolfenden lifted or caused to be lifted the blocks on www.intrade.com which allowed U.S. customers to trade commodity contracts. Wolfenden Dep. at 112:16-22, 113:1-14, 113:15-22, 114:1-10. Wolfenden may have lifted blocks on currency contracts as well. Wolfenden Dep. at 114:11-22, 115:12. Although TEN argues that "Intrade did not permit U.S. customers to trade contracts that were specifically identified in the 2005 Commission Order," TEN and Intrade traded contracts that were identical to the contracts specifically identified in the 2005 Commission Order, including contracts such as Daily Crude Oil,

Light Sweet Crude Oil Futures Year End, Intraday Euro versus U.S. Dollar Rate, and U.S. Dollar versus Yen Cash Rate. 2005 Commission Order at 2; Harris Decl. ¶¶ 9-11.

TEN argues that it should not be responsible for the actions of its then-director and officer John Delaney because "record evidence exists to support a finding that Delaney was not acting within the scope of his authority as Defendants' representative" when he asked Wolfenden to remove the blocks. Defs.' Opp'n at 16-17. However, Section 2(a)(1) of the Act, 7 U.S.C. § 2, states that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

TEN further argues that "corporations are not responsible for an agent whose actions are adverse to the company's interests." Defs.' Opp'n at 16 (citing *BCCI Holdings (Luxembourg) S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997)). Yet TEN misstates the law of the adverse interest exception; the exception only applies when the officer or agent acts with an interest adverse to the corporation. *BCCI Holdings*, 964 F. Supp. at 478 (holding that "the adverse interest exception applies only to fraud *against* the corporation, not to fraud *on behalf* of the corporation"). In this case, John Delaney was acting in scope of his employment and not with an interest adverse to TEN. Delaney was a director of TEN from 2003 until his death in May 2011. Bernstein Dep. at 58:14-19, Dec. 18, 2014. Delaney was in charge of the daily operations at TEN and Intrade from some time prior to 2007 until he died in May 2011. Bernstein Dep. at 59:21-22, 60:1-22, 61:1-22, 62:1-22, 63:1-6, Dec. 18, 2014. Unlike Delaney's alleged misappropriation of funds from TEN, his decision to lift the blocks on banned contracts was not made with an interest diverse to TEN

since it directly benefited TEN by allowing the company to collect trading fees from U.S. customers.

Second, TEN violated the 2005 Commission Order by violating the requirement that U.S. customers be informed regarding which contracts they are not allowed to trade. As discussed above, John Delaney ordered blocks on commodity and currency markets to be lifted. Wolfenden Dep. at 112:13-15. Furthermore, during the relevant period, these blocks were not in effect for a total of 2,027 contracts in commodities, currencies, gasoline, climate and weather, and U.S. economic numbers. Harris Decl. ¶ 16.

3d, TEN violated the 2005 Commission Order by failing to provide CFTC with written notice of its intent to change its U.S. representative within fourteen days before it occurred. TEN's U.S. representative, Michael Philipp, Esq., withdrew as counsel for TEN in February 2012. Answer ¶ 32. TEN did not provide the CFTC with written notice regarding its intent to change the designated U.S. representative. TEN's Resp. Req. Admis. No. 37.

## IV. CONCLUSION.

For the aforementioned reasons, the Court finds that there are no genuine disputes as to any material fact in this case. Plaintiff's motion for partial summary judgment on Counts I and II will be GRANTED.

A separate order consistent with this opinion shall issue this date.

It is **SO ORDERED** this 31st day of July 2015.

*Royce C. Lamberth*
ROYCE C. LAMBERTH
United States District Judge