**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 12-1902 (RCL) |
| TRADE EXCHANGE NETWORK LIMITED, an Irish company, and INTRADE THE PREDICTION MARKET LIMITED, an Irish company, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S MOTION AND BRIEF IN SUPPORT AS TO THE APPROPRIATE AMOUNT OF DISGORGEMENT AND CIVIL MONETARY PENALTIES FOR DEFENDANTS' VIOALTIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### INTRODUCTION

In its August 3, 2015 Order (Dkt. No. 61) and Memorandum Opinion (Dkt. No. 60), the Court granted Plaintiff Commodity Futures Trading Commission's ("CFTC" or "Commission") Motion for Partial Summary Judgment as to Counts I and II (Dkt. No. 47). The Court found that Defendants Trade Exchange Network Limited ("TEN") and Intrade the Prediction Market Limited ("Intrade") (collectively, "Defendants") allowed U.S. customers to trade 5,503 prohibited option contracts involving Commission regulated commodities from September 2007 to June 25, 2012 (the "relevant period") through their website, *www.intrade.com.* In so doing, Defendants violated Section 4c(b) of the Commodity Exchange Act ("CEA" or the Act), 7 U.S.C. § 6c(b) (2012), and Commission Regulation ("Regulation") 32.11, 17 C.F.R. § 32.11 (2012). The Court also found that TEN violated a 2005 administrative order the Commission

1

entered against TEN (the "2005 Order") by (1) offering for trade to U.S. customers through the *www.intrade.com* website 5,503 option contracts involving commodities prohibited by the Act and Regulations during the relevant period, (2) failing to have blocks in place as to U.S. customers on 2,027 prohibited option contracts involving commodities regulated by the Act and Regulations during the relevant period, (3) lifting on December 29, 2010 blocks on prohibited commodity and currency option contracts, and (4) failing to provide the Commission with written notice of its intent to change its U.S. representative within fourteen days before it occurred.  In so doing, Defendants violated Section 6c of the Act, 7 U.S.C. § 13a-1 (2012).

On October 7, 2015, the Court set forth a schedule for the parties to brief it as to the appropriate amounts of disgorgement and civil monetary penalties for Defendants' liability and violations of the Act and Regulations (Dkt. No. 69).[1]

As to the appropriate amount of disgorgement, the Commission respectfully contends that the Court should order Defendants to disgorge the balance of U.S. customer funds that are still in their custody and control and remit those funds back to those customers.  This will prevent Defendants from being unjustly enriched by their illegal activity.

As to appropriate amount of a civil monetary penalty, the Commission respectfully contends that the Court should impose a substantial civil monetary penalty against Defendants, jointly and severally, of not less than $3,000,000 because: (1) Defendants' misconduct was extremely serious as it violated core provisions of the Act and Regulations, namely the Commission's control over domestic futures exchanges and its ability to regulate commodity options, by (a) allowing U.S. customers to trade thousands of prohibited option contracts during the relevant period, and (b) deliberately violating key components of the 2005 Order; (2) the

---

[1]      That same day the Court granted Plaintiff's Unopposed and Voluntary Motion to Dismiss with Prejudice Count III of Its Complaint Against Defendants (Dkt. No. 70).

misconduct was not an isolated mistake arising from an ambiguous statutory duty or from circumstances that were unique and unforeseeable but rather consisted of thousands of intentional violations of and disregard for the Act and Regulations over an approximately five-year period; (3) Defendants failed to cooperate with the Commission when, pursuant to the 2005 Order, the Commission first alerted Defendants of their misconduct, and then, notwithstanding the Commission's inquiries, failed to cease their misconduct until after the Commission filed suit in this Court; (4) there are no particular mitigating or aggravating circumstances that alleviate the Defendants' misconduct; and (5) the amount is appropriate and reasonable given that under the Act and case law the Commission could seek a civil monetary penalty of $140,000 per violation for each and every of the thousands of violations that Defendants committed.

In support of its position as to these amounts for disgorgement and a civil monetary penalty, the Commission states the following:

## ARGUMENT

### I. DISGORGEMENT

#### A. Legal Standard

It is well-settled law that in a civil enforcement action brought pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), a district court may order ancillary equitable relief that it deems appropriate, including restitution and disgorgement. *CFTC v. Kimberlynn Creek Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("[i]t is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]"); *CFTC v. Am. Metals Exchange Corp.*, 991 F.2d 71, 76 (3d Cir. 1993) ("It is well recognized that a court may order the divestments of the benefits of unlawful activity" and that "a number of courts have held that district courts have the power to order disgorgement as a remedy for violations of the Act for 'the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of the

law'" (quoting *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir. 1986));

*CFTC v. Co. Petro Mktg. Group, Inc.*, 680 F.2d 573, 582–84 (9th Cir. 1982) (determining that the

court has the power to order disgorgement as ancillary relief under the CEA); *CFTC v. Hunt*, 591

F.2d 1211, 1223 (7th Cir. 1979) (concluding that "a district court may compel a violator of [the

CEA] to disgorge his illegally obtained profits"); *see also United States v. Universal Mgmt.*

*Servs., Inc.,* 191 F.3d 750, 760–61 (6th Cir.1999) ("[r]estitution and disgorgement are part of the

court's traditional equitable authority").  This authority is founded on the well-established legal

principle articulated by the Supreme Court in *Porter v. Warner Holding Co.:*

> Unless otherwise provided by statute, all the inherent equitable powers of the
> District Court are available for the proper and complete exercise of that
> jurisdiction.  And since the public interest is involved in a proceeding of this
> nature, those equitable powers assume an even broader power and more flexible
> character than when a private controversy is at stake.  Power is thereby resident in
> the District Court, in exercising this jurisdiction, "to do equity and to mould each
> decree to the necessities of the particular case."

*Porter,* 328 U.S. 395, 398, 66 S.Ct. 1089, 1086 (1946) (quoting *Hecht Co. v. Bowles*, 321 U.S.

321, 329, 64 S.Ct. 587, 592 (1944)).

Further, in 2010, Congress amended the Act[2] to include new Section 6c(d)(3), 7 U.S.C. §

13a-1(d)(3) (2012).  Section 6c(d)(3), which become effective on July 16, 2011,[3] provided a

statutory basis for the Commission to seek– and for the Courts to award – a full range of

equitable remedies, including restitution and disgorgement.  In particular, Section 6c(d)(3) of the

Act provides that:

> (3) Equitable remedies

---

[2]     As relevant here, see: Section 744 of the Dodd-Frank Wall Street Reform and Consumer
Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, § 744, 124 Stat. 1376, 1735 (July 21, 2010).

[3]     Section 754 of Dodd Frank provides that the general effective date for certain provisions of
subtitle A of title VII of Dodd Frank that did not require a rulemaking, including Section 744, was 360
days after enactment, or July 16, 2011.

> In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including--
>
> (A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and
>
> (B) disgorgement of gains received in connection with such violation.

Section 6c(d)(3) became effective during the relevant period.  Accordingly, the Court has a statutory basis, in addition to its inherent equitable authority to order disgorgement and/or restitution for Defendants' wrongdoing.[4]

**B. So That Defendants Are Not Further Unjustly Enriched By Their Misconduct, The Court Should Order Defendants To Disgorge The Balance Of All U.S. Customer Funds That Are Still In Their Custody And Control And Remit The Funds Back To Those Customers**

The Commission believes that currently Defendants have U.S. customer funds in their custody and control that they obtained in connection with their violations of the Act and Regulations that they are not entitled to retain.  As such, because if Defendants retain those funds they will be unjustly enriched at the expense of those customers, the Court should order that Defendants disgorge any U.S. customer funds still in their custody or control and remit those funds back to those U.S. customers.

---

[4]     Because Section 6c(d)(3) is solely remedial and simply codified the existing case law that the Commission may seek disgorgement and restitution for Defendants' violations of the Act and Regulations, and thus, did not increase Defendants liability for their past conduct, it applies to Defendants' violations prior to the effective date of that section (*i.e.*, retroactively), as well as their violations after the effective date. *See Landgraf v. USI Film Products*, 511 U.S. 244, 280, 114 S.Ct. 1483, 1505 (1994) (in clarifying the proper analysis for deciding whether a statute enacted while an appeal was pending and should apply to events and conduct that occurred before the statute's enactment, the Court held that a federal statute can apply retroactively to past conduct so long as, among other things, it does not increase a party's liability for past conduct); *see also Bradley v. School Bd. Of Richmond*, 416 U.S. 696, 94 S. Ct. 2006 (1974) (finding that where district court had awarded attorney's fees and costs upon general equitable principles to parents who had prevailed in an action seeking to desegregate public schools of Richmond and where, during appeal of that case, Congress enacted a statute that authorized federal courts to award prevailing parties in school desegregation cases their reasonable attorney's fees, court of appeals erred in holding that new fee provision of statute did not apply retroactively to case).

After the Commission filed its suit against Defendants on November 26, 2012, Defendants (1) notified U.S. customer by email and through the website that they were barring U.S. customers from trading any financial instruments on their website, *www.intrade.com*, and closing those customers' accounts, and (2) told those customers to withdraw their money from their trading accounts.  (*See* Exhibit ("Ex.") 1 hereto, Excerpt from October 9, 2014 Deposition of Carl Wolfenden at 226:1–227:22 (also located at Dkt. No. 56-11); *see also* Ex. 2 hereto, "Intrade Bars U.S. Bettors After Regulatory Action" at *http://dealbook.nytimes.com /2012/11/26/after-regulatory-sanction-intrade-closes-to-u-s-investors/*).  During discovery, however, the Commission learned that a significant portion of funds belonging to U.S. customers were still in Defendants custody and control and had not been returned to those customers despite the fact that, following the Commission's lawsuit, Defendants had barred those customers from trading any contracts on their website.

Specifically, on October 15, 2014, Defendants supplemented their responses to certain interrogatories propounded by the Commission and revealed that on August 26, 2014, "all of TEN's and Intrade's U.S. customer funds were transferred from Danske Bank [in Ireland] to Santander Bank, N.A., 330 Madison Avenue, Manhattan, NY 10017, Account No. [XXXX]7142."  (*See* Ex. 3 hereto, TEN's Third Supplemental Responses to Plaintiff's First Set of Interrogatories at Interrogatory No. 8 (also located at Dkt. No. 35-12); Ex. 4 hereto, Intrade's Third Supplemental Responses to Plaintiff's First Set of Interrogatories at Interrogatory No. 8 (also located at Dkt. No. 35-13)).  Thereafter, during his December 19, 2014 deposition, Ronald Bernstein, Defendants' CEO, provided the Commission with (1) a printout of a Santander online banking dashboard for Defendants' Santander Bank Account that showed the balances and transactions in the account from August 13 to October 14, 2014, and (2) a spreadsheet download

from Defendants' database of all U.S. customers who still had positive balances with Defendants as of October 17, 2014.  (*See* Ex. 5 hereto, Excerpt from December 19, 2014 Deposition of Ronald Bernstein ("Bernstein Dep.") at 150:20–160:14 (also located at Dkt. No. 56-17) and Ex. 13 thereto (also located at Dkt. No. 56-18)).  The dashboard printout for Defendants' Santander Bank Account showed an account balance of $839,617.54 as of October 17, 2014,[5] and the database spreadsheet for that same date showed that Defendants' U.S. customers had a balance of $483,993.  (*See* Ex. 5, Bernstein Dep. at 158:20–159:8 and Ex. 13 thereto.)  Mr. Bernstein also testified that as of October 17, 2014, $483,993 of the $839,617.54 in Defendants Santander Bank Account belonged to U.S. customers.  (*See* Ex. 5 hereto, Bernstein Dep. at 152:6–153:1).[6]

Further, the Commission has reason to believe that Defendants still may be retaining some portion of U.S. customer funds to date that they obtained in connection with their violations of the Act and Regulations,[7] even though Defendants are no longer allowing those U.S. customers to trade on their website.  Therefore, because there is no apparent reason for

---

[5]     The dashboard printout also showed an incoming transfer to Defendants' Santander Bank Account of $907,012.01 on August 26, 2014.  Presumably this is the transfer of funds from Defendants' Danske Bank Accounts referred to in Defendants' supplemental interrogatory responses.

[6]     Mr. Bernstein also testified that since the date of the U.S. customer spreadsheet, October 17, 2014, to the date of his deposition, December 19, 2014, he believed that some U.S. customers had withdrawn additional funds from Defendants but that the balance of U.S. customers' funds in Defendants custody or control was still above $400,000.  (*See* Ex. 5 hereto, Bernstein Depo at 159:14 – 160:14).

[7]     In order to decide the disgorgement issue with Defendants and streamline that issue for the Court, on October 15, 2015 the Commission proposed the same relief that it seeks from the Court here: that Defendants return the existing balance of funds to U.S. customers.  (*See* Ex. 6 hereto, Declaration of James W. Deacon ("Deacon Decl.") at ¶ 2).  Specifically, the Commission proposed that the parties agree that the Defendants would return the existing balance of funds to U.S. customers and could utilize the National Futures Association, a self-regulatory organization overseen by the Commission, which could act as a monitor for the funds and administer the distribution of the funds back to the customers.  (*Id.* at ¶ 3)  The Commission also informed Defendants that if they agreed to the proposal, then the Commission would need an up-to-date snapshot of the Santander online banking dashboard as well as the spreadsheet showing all U.S. customers who still have balances with Defendants.  (*Id.* at ¶¶ 4-5)  On October 26, 2015, Defendants declined the Commission's proposal without providing any explanation.  (*Id.* at ¶ 6)

Defendants to retain those U.S. customers' funds,[8] they obtained those funds in connection with their violations of the Act and Regulations, and if Defendants retain those funds, then they will be unjustly enriched at the expense of those customers,[9] the Court should order that Defendants disgorge any U.S. customer funds still in their custody or control and remit those funds back to those U.S. customers.[10]

## II.  CIVIL MONETARY PENALTIES

### A.  Legal Standard

Under Section 6c(d)(1)(A) of the Act, the Commission may seek and the Court has authority to impose on any person found in an action to have committed any violation of the Act or Regulations a civil penalty in the amount of (1) triple the monetary gain to that person for

---

[8]    During his December 19, 2014 deposition, Mr. Bernstein stated:

"So we were telling customers that ***after trading was no longer permitted for U.S. customers***, that we would – and if they decided not to for whatever reason withdraw their funds from their account, which made no sense because they weren't allowed to trade anymore.  ***There's no reason for us to have their funds*** – that if they didn't withdraw their funds by a certain amount of time, we would put all of the customer funds into an account specifically designated for customer funds.  And we were telling them it was a ring fenced account to give them confidence that it wasn't that it was an account from which we would not spend money related to company expenses but it would be kind of a custodianship account."

(*See* Ex. 7 hereto, excerpt from December 19, 2014 Deposition of Ronald Bernstein at 137:3–19 (also located at Dkt. No. 56-17) (emphasis added)).

[9]    The Defendants also unjustly enriched themselves by collecting various trading fees from U.S. customers in connection with the 5,503 prohibited option contracts.  Though within its rights, the Commission, however, has decided not to seek disgorgement of those fees since, even though Defendants' misconduct was serious, intentional and long lasting, Defendants' misconduct does not appear to have involved fraud.

[10]    Upon awarding disgorgement, a district court may exercise its discretion to direct the money towards either customer compensation or to the United States Treasury.  *See SEC v. Cavanagh*, 445 F.3d 105, 117 (2nd Cir. 2006) (citing *SEC v. Fischbach Corp.*, 133 F.3d 170, 175–76 (2nd Cir. 1997)); *Off. Comm. of Unsecured Creditors of Worldcom, Inc. v. SEC*, 467 F.3d 73, 81 (2nd Cir. 2006) ("'it remains within the court's discretion to determine how and to whom the [disgorged funds] will be distributed'") (quoting *Fischbach*, 133 F.3d at 175).  The Commission requests here that the Court direct the money back to the U.S. customers who have balances in their trading accounts that Defendants have not yet returned.

each violation of the Act or Regulations, or (2) $130,000 for each violation from October 23, 2004 through October 22, 2008, and $140,000 for each violation on or after October 23, 2008. 7 U.S.C. § 13a–1(d)(1)(A) (2012) and 17 C.F.R. § 143.8(a)(1)(ii) (2012).

Civil monetary penalties serve a number of purposes:

> "These penalties signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed violations intentionally.  Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost.  To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct."

*CFTC v. Emerald Worldwide Holdings, Inc.,* No. CV03–8339, 2005 WL 1130588, at * 11 (C.D. Cal. Apr. 19, 2005) (quoting *In re GNP Commodities, Inc.* [1990–92 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC 1992), *aff'd sub nom. CFTC v. Monieson,* 996 F.2d 852 (7th Cir. 1995)).

In setting a civil monetary penalty, the Court has broad discretion and is free to fashion a penalty that is appropriate to the gravity of the offense and sufficient to act as a deterrent.  *See Miller v. CFTC,* 197 F.3d 1227, 1236 (9th Cir.1999).  Thus, "[i]n determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations."  *CFTC v. Noble Wealth Data Info. Svcs., Inc.,* 90 F.Supp.2d 676, 694 (D. Md. 2000).  Of importance, conduct that violates the core provisions of the Act should be considered extremely serious.  *See JCC, Inc. v CFTC,* 63 F.3d 1557, 1571 (11th Cir. 1995). Thus, civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that the penalties should make it financially detrimental to a defendant to fail to comply with the Act so that the defendant would rather comply than risk violations.  *In re Grossfeld,* [1996–1998

Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467–8 (CFTC Dec. 10, 1996), *aff'd,* 137 F.3d 1300 (11th Cir. 1998)*; see also Reddy v. CFTC,* 191 F.3d 109, 123 (2d Cir.1999) (civil monetary penalties serve to further the Act's remedial policies and to deter others from committing similar violations).

Further, besides considering the seriousness of the violations, other factors that courts consider in setting the civil monetary penalty are the following:  whether the violation was an isolated mistake arising from an ambiguous statutory duty or from circumstances that are unique and unforeseeable; whether or not scienter was involved; the particular mitigating or aggravating circumstances presented by the unique facts of the individual conduct at issue; any benefit to the violator; any harm to the investors or market; any attempt to cure the violations; post violation conduct; cooperation with authorities; and any attempt to provide restitution.  *See JCC,* 63 F.3d at 1571; *Noble Wealth*, 90 F.Supp.2d at 694; *In re Premex, Inc.,* [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,165 at 34,892 to 34,893 (CFTC Feb. 17, 1988).

Finally, in setting a civil monetary penalty, courts may also consider a defendant's ability to pay the penalty and "not set a figure which is impossible for a defendant to comply with due to a lack of monetary resources" but will weigh that factor against the other factors discussed above including, most importantly, the gravity of a defendant's misconduct.  *See CFTC v. King*, 2007 WL 1321762 at *5 (N.D. Tex. May 7, 2007) (quoting *CFTC v. AVCO Fin. Corp.*, 28 F.Supp.2d 104, 121 (S.D.N.Y. 1998)).

**B. The Court Should Impose A Substantial Civil Monetary Penalty Against Defendants Of Not Less Than $3,000,000 For Their Misconduct**

*1. Defendants' Misconduct Violated A Core Provision Of The Act, Namely The Commission's Authority And Control Over Domestic Futures Exchanges And Its Ability To Regulate Commodity Options*

By allowing U.S. customers to trade thousands of prohibited option contracts during the relevant period and by deliberately violating key components of the 2005 Order, Defendants violated core provisions of the Act and Regulations, namely the Commission's authority and control over domestic futures exchanges and its ability to regulate commodity options.

As described in Section 3(b) of the Act, the purpose of Act is "to serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission." 7 U.S.C. § 5(b) (2012). One of Congress's fundamental purposes in enacting the CEA was to ensure "fair practices and honest dealings on [] commodity exchanges and *provide a measure of control over those forms of speculative activity*." S. Rep. No. 93-1131, 93d Cong., 2d Sess. 14, 1974 U.S.C.C.A.N. 5843, 5844, 1974 WL 11581 (Aug. 29, 1974) (emphasis added).[11] To effectuate this purpose, the Act creates a comprehensive regulatory scheme premised on the Commission's control over domestic futures exchanges and the trading of future contracts on those exchanges and grants "broad authority to the Commission to regulate futures trading and exchange activities." *Id.* at 5845; *see also Tamari v. Bache & Co. (Lebanaon) S.A.L.*, 730 F.2d 1103, 1106 (7th Cir. 1984).

---

[11]  Congress has authorized the regulation of domestic commodity futures exchanges for almost a hundred years when in 1922 it enacted the Grain Futures Act, 42 Stat. 998.

**a. By Allowing U.S. Customers To Trade 5,503 Prohibited Option Contracts Involving Commission Regulated Commodities Off-Exchange, Defendants Violated The Commission's Authority And Control Over Domestic Futures Exchanges And Its Ability to Regulate Commodity Options**

With that authority in mind, the Commission, using its authority over domestic futures exchanges that Congress granted it, barred commodity options in 1978, unless (with limited exception not applicable here) those options were traded on Commission designated contract markets, *i.e.*, "on exchange." Indeed, "[i]n 1974, Congress, greatly concerned by pervasive fraud in the commodity option industry, broadened regulation of options transactions and vested in the [CFTC] plenary rulemaking powers" over all option transactions, including the power to "ban option transactions altogether." *CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1152 and n. 3 (S.D.N.Y. 1979) (citations omitted); *see also*, *British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, 485-890 & 490 n. 13 (2nd Cir. 1977) (discussing the history of the Commodity Exchange Act and the creation of the CFTC).[12] Accordingly, Section 4c(b) of the Act makes it unlawful to:

> [O]ffer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", *contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe*.

7 U.S.C. § 6c(b) (2012) (emphasis added).[13]

"In 1978, the Commission, persuaded that its attempts at less restrictive regulation had failed because 'the offer and sale of commodity options has for some time been and remains

---

[12]      *See also*, Commodity Futures Trading Commission Act of 1974, S.Rep. 93-1131, at 5866 (1974) (Conf. Rep.) (adopting the House provision and noting that version gave the CFTC "authority to prohibit trading in options of any kind").

[13]      Section 4c(b) was enacted in 1974.

permeated with fraud and other illegal or unsound practices,' adopted a regulation banning transactions in commodity options." *CFTC v. American Board of Trade, Inc.*, 803 F.2d 1242, 1247 (2d Cir. 1986) (quoting 43 Fed. Reg. 16153, 16155 (Apr. 17, 1978)); *see also Rosenthal v. Bagley*, 450 F. Supp. 1120, 1123-24 (N.D. Ill. 1978) (finding that the CFTC acted fully within its Congressional authority in banning options trading). Regulation 32.11(a) incorporated this ban by providing that "it shall be unlawful . . . for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged." 17 C.F.R. § 32.11(a) (2012). Regulation 32.11(b) provided a limited exception to this ban for commodity option transactions that are "conducted on or subject to the rules of a contract market or a foreign broad of trade in accordance with the provisions of section 4c of the Act and any rule, regulation or order promulgated thereunder." 17 C.F.R. § 32.11(b) (2012).

These are precisely the provisions of the Act and Regulation that the Defendants violated. By enabling U.S. customers to trade 5,503 prohibited option contracts involving commodities regulated by the Act through their website during the relevant period in violation of these provisions of the Act and Regulations, Defendants violated the core provisions that the Commission has control over domestic futures exchanges and its ability to regulate commodity options on and through those exchanges.

> **b.  By Violating The 2005 Order When It (i) Offered To Trade The Prohibited Option Contracts, (ii) Failed to Have The Required Blocks In Place To U.S. Customers, (iii) Deliberately Lifted The Blocks, And (iv) Failed To Notify The Commission Of Its Intent To Change Its Representative, TEN Violated The Commission's Authority And Control Over Domestic Futures Exchanges And Its Ability to Regulate Commodity Options**

TEN also violated these core provisions when it violated the 2005 Order. Congress granted the Commission in Section 6(d) of the Act the authority to issue cease and desist orders

for violations of any of the provisions of the Act or of the rules, regulations or orders of the

Commission.  7 U.S.C. § 13b (2012).  With that authority, the Commission entered the 2005

Order with TEN in which TEN agreed to refrain from violating Section 4c(b) of the Act and

Regulation 32.11 and cease and desist from offering prohibited commodity option contracts on

its website.  (*See* 2005 Order at Dkt. No. 47-3).  TEN, however, undercut that authority and

disregarded the Commission's ban on off-exchange options trading when it (1) offered for trade

through Defendants' website to U.S. customers 5,503 option contracts involving commodities

prohibited by the 2005 Order during the relevant period, (2) failed to have the required blocks in

place as to U.S. customers on 2,027 prohibited option contracts during the relevant period, (3)

deliberately lifted the blocks on prohibited option contracts in commodity and currency markets

on December 29, 2010, and (4) failed to provide the Commission with written notice of its intent

to change its U.S. representative within fourteen days before it occurred.

     TEN's conduct directly challenges the Commission's ability to police the markets it

regulates.  Much as a court controls its courtroom by issuing orders, expects a party to obey

those orders, and a party's failure to obey those orders is a direct challenge to the court's

authority, so too does the Commission control the areas that it regulates by issuing orders,

expects a person to obey those orders, and a person's failure to obey those orders is a direct

challenge to the Commission's authority.  Here there is no doubt that TEN's flagrant disregard of

the 2005 Order, violated core provisions of the Act.

### 2. *The Misconduct Was Not An Isolated Mistake But Rather Consisted Of Thousands of Intentional Violations And Reckless Disregard For The Law*

     Defendants allowed U.S. customers to trade 5,503 prohibited contracts over a five-year

period in Commission regulated commodities including gold and light sweet crude oil,

currencies, gasoline, climate and weather, and U.S. economic numbers.  Defendants cannot

maintain that they did not know that the contracts they enabled U.S. customers to trade during the relevant period were not prohibited by the Act.  Indeed, as the Court found "[Defendants] traded contracts that **_were identical_** to the contracts specifically identified in the in the 2005 Order."  (*See* Memorandum Opinion (Dkt. No. 60) at 15-16 (emphasis added)).  This is not a case where Defendants offered a few prohibited contracts that were briefly traded such that Defendants' misconduct was an isolated mistake.[14]

Additionally, Defendants' misconduct was intentional and they recklessly disregarded the law because (1) despite TEN having agreed to do so in the 2005 Order, Defendants did not block over 2,000 prohibited contracts in commodities, currencies, gasoline, climate and weather and U.S. economic numbers during the relevant period to U.S. customers; and (2) at the end of 2010, Defendants' then director and officer, John Delaney, instructed Defendants' Exchange Operations Manager, Carl Wolfenden, "to disengage the existing blocks" on Defendants' website and "permit U.S. customers to trade contracts in commodity and currency markets" that were prohibited by the 2005 Order.  (*See* Memorandum Opinion at 5-6 and 15-16).

Consequently, Defendants' misconduct cannot be considered as an isolated mistake; rather, Defendants' misconduct was intentional and they recklessly disregarded the law.[15]

---

[14]    Moreover, Defendants cannot maintain that there were only a few isolated customers that traded the prohibited contracts.  Of the 5,503 prohibited contracts that were traded by U.S. customers during the relevant period, there were 1,275 distinct U.S. customers that traded those contracts.  (*See* Ex. 8 hereto, Declaration of Jessica Harris ("Harris Decl.") at ¶ 7).

[15]    Indeed, as the Commission explained in its Motion for Partial Summary Judgment as to Counts I and II (Dkt. No. 47, the "Motion for Summary Judgment"), as early as 2001, TEN was advised by its U.S. counsel that binary option contracts based on commodities, weather events, U.S. economic numbers, and other events could not be offered to U.S. customers unless traded on a designated contract market ("DCM") or an exempt board of trade.  (Motion for Summary Judgment at 17)  Then, in 2008, another of Defendants' counsel confirmed that binary options weather events, such New York City snowfall events, were prohibited by the CEA and Regulations unless traded by a DCM or EBOT.  (*Id.*)

### 3. Defendants' Failed To Cooperate With The Commission When They First Learned Of The Misconduct And Failed To Cease The Misconduct Once It Came To Their Attention

As explained in its Motion for Summary Judgment, in December 2011 when the Commission learned that Defendants apparently were allowing U.S. customers to trade contracts on their website prohibited by and in violation of the 2005 Order, the Commission endeavored to obtain Defendants' cooperation in its investigation into their misconduct. Yet, time and again Defendants stymied the Commission's efforts. (*See* Motion for Summary Judgment at 17-18).

In particular, the Commission first sent a letter dated December 28, 2011 ("December 28, 2011 Letter") to TEN's designated representative under the 2005 Order, Michael Philipp, Esq. ("Philipp") of Winston & Strawn LLP, and requested that TEN comply with Part VII.3.C of the 2005 Order, in which TEN agreed "to cooperate fully and expeditiously with the Commission . . . in any investigation, civil litigation, or administrative matter related to the subject matter of th[e] [Order]" (*Id.* at 17; *see also* 2005 Order at Dkt. No. 47-3), by producing certain requested documents to the Commission. Although TEN received the December 28, 2011 Letter by facsimile that same day, rather than comply with the request and cooperate as it agreed to do, TEN provided but a small fraction of the requested documents. (*See* Motion for Summary Judgment at 17-18 (Dkt. No. 47)).

Thereafter, on February 1, 2012, the Commission issued administrative subpoenas to both TEN and Intrade. (*Id.* at 18) Winston & Strawn advised that they were not permitted to accept service on behalf of either TEN or Intrade because Mr. Philipp had left the firm, and Winston & Strawn withdrew as counsel for TEN (*Id.*) Further, TEN did not designate a new U.S. representative to replace Mr. Philipp as required by the 2005 Order. TEN or Intrade also wholly failed to cooperate with the Commission during this period. (*Id.*)

16

Subsequently, by letter dated March 8, 2012 ("March 8, 2012 letter"), the Commission forwarded to Dan Laffan, Defendants' then director and CEO, a copy of the December 28, 2011 Letter requesting documents, and copies of the February 1, 2012 administrative subpoenas to TEN and Intrade.  (*Id.*)  The March 8, 2012 Letter advised Mr. Laffan, among other things, that TEN was obligated under the 2005 Order to identify a successor U.S. designee to receive Commission requests, that TEN had failed to do so, and further advised that "If TEN has not fully cured its violations of the 2005 Order . . . on or before March 23, 2012, the Division will take all necessary steps to enforce the 2005 Order and compel TEN's compliance."  (*Id.*) Despite this admonition, TEN did not provide the Commission notification of its intent to change the person it had designated, or designate a new U.S. person pursuant to the 2005 Order to receive written requests from the Commission.  Further, Defendants continued their lack of cooperation with the Commission in its ongoing investigation. (*Id.*)

Furthermore, even though they were on notice as of December 28, 2011 as to their misconduct, Defendants did not cease their misconduct until after the Commission filed its suit against them on November 26, 2012.  Specifically, it was only after the Commission sued them for their misconduct that they then (1) notified U.S. customer by email and through the website that they were barring U.S. customers from trading any financial instruments on their website, *www.intrade.com*, and closing those customers' accounts, and (2) told those customers to withdraw their money from their trading accounts.

### 4.   *There Are No Mitigating Factors Which Would Alleviate The Misconduct And/Or Dictate A Lower Civil Monetary Penalty*

There are no mitigating factors which would alleviate Defendants' misconduct and/or dictate a lower civil monetary penalty.  First, Defendants were on notice that allowing U.S. customers to trade through their website certain commodity option contracts was a violation of

Section 4c(b) of the Act and Regulation 32.11.  The 2005 Order was quite specific that "TEN, through its websites, offers for trading to U.S. residents, as well as residents of all other nations, commodity option contracts" including those in gold, oil currencies and U.S. economic numbers which were subject to the Commission's ban on commodity option contracts.  Defendants' knowledge of its wrongdoing is in contrast to other cases in which a defendant may not know that its conduct violated a federal law.  In those cases, a mitigating element may be present.  That mitigating element does not exist in this case.

Second, the Commission recognizes that courts may also consider a defendant's ability to pay the penalty in its overall analysis as to the appropriate amount of the civil monetary penalty.  If the Court determines that ability to pay is a factor that it will consider, the Commission believes (1) that Defendants have the ability to pay a significant civil monetary penalty here despite Defendants likely protestations of poverty, (2) that even if Defendants do not have the ability to pay, the gravity of Defendants' misconduct still requires the imposition of a significant civil monetary penalty, and (3) that in requesting that the Court impose a civil monetary penalty of $3,000,000 against Defendants for their misconduct, the Commission already has taken into consideration Defendants' claims of poverty and has tempered the amount of a penalty that it could seek against Defendants.[16]

As to whether Defendants actually have the ability to pay, a review of Defendants' bank records reveals that, during the course of this litigation significant funds were transferred from Intrade's Danske Banke account  (Account No. XXXX1066) located in Ireland, to both Ron

---

[16]     Defendants' counsel have repeatedly informed Commission counsel that Defendants do not have the ability to pay a significant civil monetary penalty for their misconduct.  Indeed, the Commission expects that in their response to this brief, that issue will be at the center of Defendants' argument concerning the reason that the Court should impose no or only a *de minimis* civil monetary penalty.

Bernstein, Defendants' director and CEO, and to a new start-up company that he launched in 2014, Tradesports.com, Inc.  (*See https://www.tradesports.com/about-us*.)

Specifically, on December 5, 2013, and January 2, and April 15, 2014, Intrade transferred $100,041.78, $100,000.00, and $25,005.54, respectively, to Mr. Bernstein.  (*See* Ex. 9 hereto, December 31, 2013 and April 30, 2014 statements from Danske Banke Account No. XXXX1066.)

Likewise, on January 30, and March 3, 2014, Intrade transferred $750,041.72 and $750,042.23, respectively, to Tradesports.com.  (*See* Ex. 10 hereto, January 31, 2014 and March 31, 2014 statements from Danske Banke Account No. XXXX1066.)  As to these transfers from Intrade to Tradesports.com, based on a February 26, 2014 email from Mr. Bernstein to Mr. Wolfenden, they appear to have been used to capitalize Tradesports.com.  (*See* Ex. 11 hereto, February 27, 2014 email chain between Mr. Wolfenden and Mr. Bernstein in which Mr. Bernstein states, "I will be sending funds approx. 725,000 USD from Intrade 1066 USD to Wells capital acct to complete the Tradesports.com, Inc. capitalization for a total of 1475000 USD.").

If Defendants claim that they are unable to pay, the Court should require them to explain why these funds were transferred to Mr. Bernstein and to Tradesports.com and why those transferred amounts should not be included in the Court's determination of whether Defendants have the ability to pay a significant civil monetary penalty.[17]  Further, the Court should demand that Defendants provide a full accounting of all of Defendants' assets through documentary

---

[17]     In addition, at least as of October 17, 2014, there were significant funds in Defendants' Santander Bank Account well in excess of the balance owed to U.S. customers as of that date.  (*See* Section I.B, *supra*, at 6-7).  Specifically, as of that date, there was $839,617.54 in that account.  According to Mr. Bernstein's testimony, only $483,993 belonged to U.S. customers.  (*Id.*)  Thus, $355,624.54 is unaccounted for.  The Court should require Defendants to explain what happened to those funds, where those funds are today, and why they should not be included in a calculation of Defendants' ability to pay.

evidence, such as bank records, financial statements and accounting records.[18]  Neither the Court

nor the Commission should be forced to rely solely on any self-serving attestations of

Defendants' alleged poverty.

Furthermore, even if Defendants cannot pay a significant civil monetary penalty, the

Court can still order a significant one based on the gravity of their misconduct.  *See King*, 2007

WL 1321762 at *5 (N.D. Tex. May 7, 2007) (holding that even though individual defendant had

no ability to pay a civil monetary penalty, court could still assess one of $449,914.65 due to

gravity of defendant's misconduct); *CFTC v. Heffernan*, 274 F.Supp.2d 1375 (S.D. Ga. 2003)

(even though defendant had shown an inability to pay a civil monetary penalty, court still assess

him with a penalty of $25,000 per violation of the Act and Regulations for a total penalty of

$125,000).

Finally, in its analysis as to the appropriate amount that the Commission should seek

from the Court for Defendants' misconduct and its determination that a $3,000,000 civil

monetary penalty is appropriate, the Commission already took into consideration Defendants'

claims of poverty and weighed those claims against the gravity of the misconduct as well as the

sheer number of violations.  (*See* discussion at Section II.B.5, *infra*)

   ***5.  A Civil Monetary Penalty Of At Least $3,000,000 Is Appropriate And Reasonable
   Given That Under The Act And Case Law The Commission Could Seek A Penalty
   of $140,000 Per Violation For Each And Every Of The Thousands Of Violations
   That Defendants Committed***

The Commission's Complaint alleges that each and every act by Defendants in violation

of Section 4c(b) of the Act and Regulation 32.11 "is alleged as a separate and distinct violation"

---

[18]     Indeed, the Commission does not believe that it has all of Defendants' bank records.  During Mr.
Bernstein's December 19, 2014 deposition, he revealed an additional Intrade bank account at Chase Bank
in Denville, New Jersey which had not been disclosed previously to the Commission.  Defendants have
produced no Chase bank records to the Commission.  (*See* Ex. 5 hereto at 155:16–157:20 (also located at
Dkt. No. 56-17)).

of the Act and Regulation and each violation of the 2005 Order and Section 6c of the Act "constitutes a separate and distinct violation of the 2005 Order and of Section 6c of the Act.  (*See* Complaint ¶¶ 46 and 51 (Dkt. No. 1)).[19]

Under the case law, the maximum civil monetary penalty "is limited by the number of violations alleged in the complaint times the maximum fine per violation."  *Slussser v. CFTC,* 210 F.3d 783, 786 (7th Cir. 2000); *see also CFTC v. Levy,* 541 F.3d 1102, 1110-11 (11th Cir. 2008).

Here, each of the 5,503 illegal option contracts offered by Defendants during the relevant period is a separate and distinct violation by Defendants of Section 4c(b) of the Act and Regulation 32.11 as well as a separate and distinct violation by TEN of the 2005 Order and Section 6c of the Act.

Likewise each time that TEN (1) offered for trade through their website to U.S. customers option contracts involving commodities prohibited by the 2005 Order during the relevant period, (2) failed to have blocks in place as to U.S. customers on prohibited option contracts during the relevant period, (3) lifted blocks on prohibited option contracts in commodity and currency markets, and (4) failed to provide the Commission with written notice of its intent to change its U.S. representative, is a separate and distinct violation of the 2005 Order as well Section 6c of the Act.

---

[19]     The Commission's Complaint specifically requests the Court to enter:

"An order requiring Defendants to pay civil penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to Defendants for each violation of the Act, the Act as amended by the Dodd-Frank Act, and the Regulations; or (2) $130,000 for each violation committed between October 23, 2004 and October 22, 2008, and $140,000 for each violation committed on or after October 23, 2008."

(*See* Complaint at p. 21, Part VIII "Relief Requested," ¶ J).

If the Commission were to total these violations and multiple them by the maximum statutory amount, the total potential civil monetary penalty that the Commission could seek from the Court would be astronomical.[20]  The Commission, of course, has not done that.  Instead, it has examined the (1) overall misconduct, namely that for five years Defendants offered thousands of prohibited commodity options contracts to U.S. customers and that TEN violated the 2005 Order in the four distinct ways as described above, (2) Defendants' scienter with respect to the misconduct, (3) Defendants' cooperation with the Commission when it first learned of the misconduct, and (4) any mitigating factors like Defendants' claim of poverty. Based on a balancing of these factors, and being mindful of the overall purpose of civil monetary penalties, that they signify the importance of particular provisions of the Act, act to vindicate these provisions in individual cases, and are also exemplary as they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost, the Commission contends that a civil monetary penalty against Defendants, jointly and severally, in the amount of $3,000,000 is appropriate.  *See, e.g. CFTC v. E-Metal Merchants, Inc.*, 1:05-cv-21571-JAL (Dkt. No. 115) (S.D. Fla. April 4, 2011) (in consent order defendant, who engaged in the purchase and sale of off-exchange gold and silver option contracts for approximately one year, was assessed  a $1,000,000 civil monetary penalty).

## CONCLUSION

For the foregoing reasons, the Commission respectively contends that the Court (1) should order Defendants to disgorge the balance of all U.S. customer funds that are still in their custody and control and remit those funds back to those customers and (2) should impose a

---

[20]    Further, even if one considers that each time Defendants allowed a distinct customer to trade a prohibited options contract as a violations, and not the individual contracts themselves, Defendants still violated the Act and Regulations 1,275 times.  (*See* n. 14, *supra*.)

substantial civil monetary penalty against Defendants, jointly and severally, of not less than

$3,000,000 and enter the attached [Proposed] Order.[21]

Dated: November 6, 2015

Respectfully submitted,

**ONE OF THE ATTORNEYS FOR PLAINTIFF**
**U.S. COMMODITY FUTURES TRADING**
**COMMISSION**

/s/ James W. Deacon

Kathleen Banar (Ill. Bar No.  6200597)
U.S. Commodity Futures Trading Commission
Division of Enforcement, 7th Floor
1155 21st Street, NW
Washington, D.C. 20581
Telephone:  (202) 418-5335
Facsimile:  (202) 418-5987
*kbanar@cftc.gov*

James W. Deacon (D.C. Bar No. 476216)
U.S. Commodity Futures Trading Commission
Division of Enforcement, 7th Floor
1155 21st Street, NW
Washington, D.C. 20581
Telephone:     202-418-5526
Facsimile:     202-418-5987
*jdeacon@cftc.gov*

---

[21]     Should the Court order disgorgement as requested by the Commission, the Commission would propose that, as has been done in other cases, the Court utilize the National Futures Association to act as a monitor for the funds and administer the distribution of the funds back to the customers, and can provide the Court with examples of such instances.

**CERTIFICATE OF SERVICE**

I, James Deacon, hereby certify that on November 6, 2015, I filed *Plaintiff's Motion and Brief in Support as to the Appropriate Amount of Disgorgement and Civil Monetary Penalties for Defendants' Violations of the Commodity Exchange Act and Commission Regulations* with the Clerk of Court using the CM/ECF system, which will automatically serve an email notification of said filing on the following attorneys of record:

A. Jeff Ifrah
IFRAH PLLC
1717 Pennsylvania Avenue, Suite 650
Washington, D.C. 20006
Telephone: (202) 524-4140
Facsimile: (202) 524-4141
*jeff@ifrahlaw.com*

Jeffrey R. Hamlin
IFRAH PLLC
1717 Pennsylvania Avenue, Suite 650
Washington, D.C. 20006
Telephone: (202) 524-4143
Facsimile: (202) 524-4141
*jhamlin@ifrahlaw.com*

/s/ James W. Deacon

*One of the Attorneys for Plaintiff,*
*U.S. Commodity Futures Trading*
*Commission*